02-12-375-CV














 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

 

NO. 02-12-00375-CV

 

 


 
 
 In
 the Matter of P.R.G.
  
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
 
 
 From County Court at Law No. 1
  
 of Wichita County (37221-LR-D)
  
 November 8, 2012
  
 Opinion
 by Justice McCoy
  
 
 


 

JUDGMENT

 

          This court has considered the record on appeal in this case and holds
that there was error in the trial court’s order.  We modify the order of the trial court to
remove the language “the patient presents a danger to the patient or others in
the inpatient facility in which the patient is being treated as a result of a
mental disorder or mental defect as determined under Section 574.1065, Texas
Health and Safety Code.”  It is ordered
that the order of the trial court is affirmed as modified.

SECOND DISTRICT COURT OF APPEALS 

 

By_________________________________

    Justice Bob McCoy

 










 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

 

NO. 02-12-00375-CV

 

 


 
 
 IN THE MATTER OF P.R.G.
 
 
  
 
 
  
 
 


                                                                                                                             

 


 
 
  
 
 
  
 
 
  
 
 


 

                                                                                                                             

------------

 

FROM COUNTY COURT
 AT LAW NO. 1 OF WICHITA
COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

I. 
Introduction

In
two issues in this accelerated appeal, Appellant P.R.G. appeals the trial
court’s order authorizing psychoactive medication under health and safety code
section 574.106.  See Tex. Health & Safety Code Ann. §§ 574.070, 574.106, 574.108
(West 2010).  We affirm as modified.

II.  Factual and Procedural Background

In
June 2012, the 15th District Court of Grayson County issued an order in
P.R.G.’s criminal assault case to confine her for a period not to exceed 120
days “for the purpose of further examination and treatment toward the specific
objective of attaining competency to stand trial.”

In
August 2012, Dr. Denis Atkinson, P.R.G.’s doctor at the Wichita Falls campus of
the North Texas State Hospital, applied for an order to administer the psychoactive
medication Haloperidol (Haldol).  After a
hearing on the application, the trial court signed the order to authorize
psychoactive medication, specifically antipsychotic medication, finding by
clear and convincing evidence, per health and safety code section 574.106(a-1),
that

the patient is in need of psychoactive
medication:

AND

the patient is in custody awaiting trial in a
criminal proceeding and was ordered to receive inpatient mental health services
in the six months preceding a hearing under this section 

AND

the patient lacks the capacity to make a
decision regarding the administration of the proposed medication and treatment
with the proposed medication is in the best interest of the patient.

the patient was ordered to receive inpatient mental
health services by a criminal court with jurisdiction over the patient and the
patient presents a danger to the patient or others in the inpatient facility in
which the patient is being treated as a result of a mental disorder or mental
defect as determined under Section 574.1065, Texas Health and Safety Code, and
treatment with the proposed medication is in the best interest of the patient[.]

This
appeal followed.

III.  Sufficiency of the Evidence

P.R.G.
complains that the evidence is legally and factually insufficient to support
the trial court’s findings under section 574.106(a-1).

A. 
Standards of Review

The
State’s burden of proof under health and safety code section 574.106 is clear
and convincing evidence.  Tex. Health & Safety Code Ann. § 574.106(a-1).  Clear and convincing evidence is that measure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.  State v. K.E.W., 315 S.W.3d 16, 20 (Tex.
2010).

In
evaluating evidence for legal sufficiency under the clear and convincing
standard, we review all of the evidence in the light most favorable to the
finding to determine whether a reasonable factfinder could have formed a firm
belief or conviction that the finding was true. 
Id.  We resolve disputed fact questions in favor
of the finding if a reasonable factfinder could have done so, and we disregard
all contrary evidence unless a reasonable factfinder could not have done
so.  Id.  The factfinder, not this court, is the sole
judge of the credibility and demeanor of the witnesses.  In re J.O.A., 283 S.W.3d 336, 346 (Tex. 2009).

In
reviewing the evidence for factual sufficiency under the clear and convincing
standard, we must determine whether, on the entire record, a factfinder could
reasonably form a firm conviction or belief that its finding was true.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  Id. 
We must not supplant the trial court’s judgment with our own.  Id. at 109.  The
factfinder is the sole judge of the credibility of witnesses and the weight to
be given their testimony.  Id.

B. 
Health and Safety Code Section 574.106(a-1)

The
trial court may issue an order authorizing psychoactive medication only if it
finds that one of the two grounds in section 574.106(a-1) has been established
by clear and convincing evidence after a hearing.  Tex. Health & Safety
Code Ann. § 574.106(a-1). 
The first ground that supports such an order is that the patient lacks
the capacity to make a decision regarding the administration of the proposed
medication and that treatment with the proposed medication is in the patient’s
best interest.  Id. § 574.106(a-1)(1).  The pertinent part of the second ground is a
determination that the patient was ordered to receive inpatient mental health
services by a criminal court with jurisdiction over the patient, that treatment
with the proposed medication is in the best interest of the patient, and that
the patient presents a danger to the patient or others in the inpatient mental
health facility in which the patient is being treated as a result of a mental
disorder or mental defect as determined under section 574.1065.  Id.
§ 574.106(a-1)(2)(A).

1. 
Dr. Atkinson’s Application

We
have set out below the information contained in Dr. Atkinson’s application for
an order to administer psychoactive medication, even though the trial court is
not authorized to base its findings solely on a physician’s application, to
provide context for Dr. Atkinson’s and P.R.G.’s testimonies at the hearing on
the application.  See Moore v. State, No. 07-10-00507-CV, 2011 WL 3587439, at *2
(Tex. App.—Amarillo Aug. 16, 2011, no pet.) (mem. op.) (citing State ex rel. E.G., 249 S.W.3d 728, 731 (Tex. App.—Tyler 2008, no
pet.).  The trial court could not base
its findings solely on the application because there must be evidence of the
factual basis of an expert opinion to satisfy the clear and convincing burden
of proof.  Id. (citing E.G., 249
S.W.3d at 732).

In
his sworn application, Dr. Atkinson stated that antipsychotic psychoactive
medication is the proper and customary course of treatment for and in the best
interest of P.R.G. but that P.R.G. had verbally refused to take the medication
voluntarily.  As the basis for his
conclusion that P.R.G. lacked the capacity to make a decision regarding
administration of psychoactive medication, Dr. Atkinson stated, “The patient is
actively delusional, lacks insight into her illness[,]
and is unable to attend to reality.  She
has a diminished capacity to understand or adhere to a treatment plan.  Currently she is not capable of acting in her
own behalf.  She lacks competency.”  He stated that P.R.G.’s prognosis was fair
with psychoactive medication treatment but that if left untreated, “the risk of
self-harm and or aggression is significantly increased.  Untreated[,] she is
at high risk to further deteriorate.”

Dr.
Atkinson averred that he had considered medical alternatives to psychoactive
treatment and less intrusive treatments likely to secure P.R.G.’s agreement to
take the psychoactive medication but had determined that the medical
alternatives would not be as effective.  He
also stated that he believed that the benefits of the psychoactive medication
outweighed the risks of such medication in relation to P.R.G.’s present medical
treatment and her best interest.  He
alternatively requested that, if the trial court found that P.R.G. had the
capacity to make a decision regarding the administration of psychoactive
medication, that the trial court order it on the basis that unless medicated,
P.R.G. “presents a danger to self or others in the mental health facility in
which [she] is being treated, as set forth in Texas Health & Safety Code §
574.1065, and treatment with the proposed medication is in [P.R.G.’s] best
interest.”

2.  Dr. Atkinson’s Testimony

At
the hearing on his application, Dr. Atkinson stated that P.R.G. was being
treated for schizophrenia and had “symptoms of both a schizoaffective with
bipolar paranoid features.”  He described
the defining characteristics of P.R.G.’s illness as follows:

She has a cognitive disturbance.  Her thinking is—has a number of secondary
psychotic phenomena.  All that means is
that she has an active delusional system. 
She lacks insight into the nature of her illness.  She is exhibiting signs of paranoia. . . .  She has also prior history of mania diagnosed,
and when she was seen at the time of her interview at SB II by the treatment
team, she appeared to be in a hypomanic phase.

Dr.
Atkinson said that the medication most likely to be helpful to P.R.G. would be
an antipsychotic medication like Haldol.

Dr.
Atkinson testified that P.R.G. had refused to take the medication voluntarily.  If medicated, he said that he would expect
that some of her agitation would decrease and that she would stop “experiencing
unseen voices talking to her.”  He noted
that P.R.G. had been very polite and compliant at times but that she had also had
some outbursts, “particularly one episode at night where she was very loud and
very verbally abusive.”  He expressed
concern that without medication, P.R.G. could experience further deterioration
of her condition “at which time she might become dangerous to herself or
others” and not become competent.  Dr.
Atkinson said that there were no alternatives that were likely to produce the
same results as the court-ordered medication, that there were no less intrusive
treatments likely to secure P.R.G.’s agreement to take the psychoactive
medication, and that therapy classes alone would not be sufficient to restore
her competency.

Dr.
Atkinson assumed that another doctor had explained the medications and their
benefits and side effects to P.R.G. when she was admitted to the state hospital.[2]  Dr. Atkinson described the side effects of the
proposed medication as ranging from tremors, shakes, muscle stiffness, and
drooling to dyskinesias and oculogyria.[3]  He said that extensive use of the medication
would result in “Parkinsonian-like syndrome,” which he said can be corrected,
and that the worst possible outcome “could be something like a tardive dyskinesia, which would
be a permanent type of movement disorder involving the face.”  Dr. Atkinson said that some of the side
effects could be corrected with other medication.

Dr.
Atkinson stated that he did not know if P.R.G. understood the risks and
benefits of the medication because “[s]he does not feel she’s ill,” but he
believed that the medication’s benefits outweighed the potential side effects,
that taking the medication was in P.R.G.’s best interest, that treatment with
medication would improve P.R.G.’s quality of life, and that taking the
medication would restore P.R.G. to competency.

During
cross-examination, Dr. Atkinson recounted P.R.G.’s past history with regard to
treatment, stating that prior to her 2008 admission, P.R.G. had discontinued
taking her medications,

[a]nd as a result, there
came about some domestic issues, violence and such.  And I believe that just prior to her being
put into the Grayson County jail, she’d had a family disturbance in which she
was again aggressive and violent, and she had not been compliant with taking
her medication.

Dr.
Atkinson acknowledged that P.R.G. was attending competency classes and had
always been compliant, agreeable, and cooperative in attending the classes and
in her rapport with some of the staff on the ward.

3.  P.R.G.’s Testimony

P.R.G.
testified that she had used Seroquel, Risperdal, Zoloft, and Abilify before and
that she did not want to take Haldol, although she had not previously used it,
because of the side effects from the other medications.[4]  P.R.G. said that in 2008, she had reached the
point where she did not have to take any kind of psychoactive medication and
had done well without it, starting college and taking care of her children.  She said that she was a semester and a half
from graduating with an associate’s degree in drug and alcohol counseling and
an associate’s degree in sociology.

P.R.G.
gave the following testimony about her interaction in her competency classes,
the “verbally abusive” incident, and hearing voices:

A. 
I’m taking competency classes, and it [coincides] with my competency
with my drug and alcohol counseling.  I’m
making a hundred on my tests.  I’m very
active.  I’m very talkative.  I’m learning from my experience in my
competency.  My teacher has stated—his
name is Steven—he said if he had got notice before, he was willing to come and
testify for me.  He feels I don’t need
the psychotic medications for my competency. 
He doesn’t understand why I’m being diagnosed as still needing it.  But if it was set to be, my court hearing was
put off, he would come and testify.  My
experience in class, he doesn’t feel for competency that because of my tests
and how I interact in class that I need psychotic meds to be competent.

Q. 
How about the RN that I asked Dr. Atkinson about?  Tell us about that.

A. 
His name is Chris.  I don’t know
his last name.  I asked him, would he
come and testify for me, how I interact with the patients and the staff.  He said, yes. 
He haven’t [sic] seen any violence in me to where he feels that I need
medication, but it was other staff members because I had gotten into it with a
staff member about getting smart with me, and I walked off grinning walking
down the hall.  And then she wrote up,
saying that I was being uncooperative and stuff because I asked her a question
about a bath or something.  I asked her
something and she played me off like I wasn’t nothing.  And I told her just because I’m a patient
here, she shouldn’t talk to me like I’m crazy. 
I’m a person, too, and that’s what started it.  So I walked down the hall and walked out of
her face when she was talking smart to me, and I just started singing to myself
and talking to the other patients like I do every morning.  I get up every morning; I talk to all the
patients:  Good morning; how are you
doing.  The ones I’m close to, I ask them
how they feel, if they want to talk, if they have anything wrong they want to
discuss or just try to be friendly to make all of our stay in the hospital
good.

Q. 
Let me ask you this.  The doctor
indicates that he—I think that he has reports that you’re talking to unseen
others or hearing voices.  Are you having
those problems?

A.  No, sir. 
I haven’t experienced it, not one time.

Q.  Do
you feel like you are delusional as you sit here today?

A. 
No, sir.

Q. 
You have made a decision that you don’t want to take the medicine, and
that’s because why?

A. 
Because when I was diagnosed with schizophrenia, it was because of drug
use with cocaine.  If you see my records
from ‘07–‘08 when I was here, I was diagnosed with schizophrenia for cocaine
usage, not because I was out and got into it with a family member or police
officer.  It was because of cocaine
use.  It wasn’t just regular
schizophrenia.

Q.  Do
you think if you don’t take the medicine, that Dr. Atkinson is correct that
you’ll—that you’ll get worse, that you’ll be more likely to be at risk of
self-harm or aggression towards others?

A. 
No, because I have—I have no feelings of doing harm to anybody nor
myself.  I’m not doing drugs
anymore.  I’m working on being clean.  Like I said, the—it was just past experience
from drug use.  I get along with my kids,
family and friends.

C.  Analysis

1. 
Danger

In
part of her first issue, P.R.G. complains that with regard to the trial court’s
findings under section 574.106(a-1)(2)(A), there is no
evidence to show that she presents a danger to herself or others in the
inpatient mental health facility.

To
make such a finding, the trial court had to consider (1) an assessment of
P.R.G.’s present mental condition, (2) whether she had inflicted, attempted to
inflict, or made a serious threat of inflicting substantial physical harm to
herself or another while in the facility; and (3) whether, in the six months
preceding the date she was placed in the facility, she had inflicted, attempted
to inflict, or made a serious threat of inflicting substantial physical harm to
another that resulted in her being placed in the facility.  See
Tex. Health & Safety Code Ann. §§ 574.106(a-1)(2)(A),
574.1065 (West 2010).  However, as set
out above, the evidence at the hearing reflected only P.R.G.’s present mental
condition.  Although P.R.G. had a
pending assault charge and was in the inpatient mental health facility in order
to regain competency so that she could stand trial for that offense, the record
does not reflect when the alleged assault occurred, and there is no evidence in
the record that P.R.G. had inflicted, attempted to inflict, or made a serious
threat of inflicting substantial physical harm to herself or another while in
the inpatient mental health facility.  See, e.g., Moore,
2011 WL 3587439, at *5 (holding that doctors’ testimonies that appellant was
loud and verbally intimidating but that appellant had not behaved in an
assaultive or aggressive manner and had not struck anyone constituted evidence
insufficient to support the finding that she presented a danger to herself or
others in the inpatient mental health facility).  Therefore, we sustain this portion of P.R.G.’s
first issue and do not reach the remaining portion.  See
id.; see also Tex. R. App. P. 47.1.

2. 
Capacity

In
part of her second issue, P.R.G. argues that the evidence is legally and
factually insufficient to support a finding that she lacks capacity under
section 574.106(a-1)(1).  “Capacity” under section 574.106(a-1)(1) means
a patient’s ability to understand the nature and consequences of the proposed
treatment, including the benefits, risks, and alternatives to the proposed
treatment, and to make a decision whether to undergo the proposed
treatment.  Tex. Health & Safety Code
Ann. §§ 574.101(1) (West 2010), 574.106(a-1)(1); E.G., 249 S.W.3d at 730.

P.R.G.
had been ordered into inpatient mental health treatment by the criminal
district court to regain competency to stand trial for an assault charge, and Dr.
Atkinson testified that P.R.G. was being treated for schizophrenia
(schizoaffective with bipolar paranoid features) and that an antipsychotic
medication like Haldol would help decrease P.R.G.’s
agitation, stop her from hearing voices, prevent further deterioration of her
condition, improve her quality of life, and help her regain competency.  He indicated that if P.R.G.’s condition
continued to deteriorate, she might become dangerous to herself or others.

As
set out above in our recitation of the evidence presented at the hearing, Dr.
Atkinson described the side effects of the medication, some of which he said
could be corrected through other medication.  In both his application and in his testimony,
Dr. Atkinson indicated that there were no medical alternatives that would
likely produce the same benefits and that therapy classes would not be
sufficient to restore P.R.G. to competency.  Dr. Atkinson testified that he did not know if
P.R.G. understood the risks and benefits of the medication because she did not
think that she was ill.[5]

P.R.G.
denied hearing voices and said that she did not feel like she was delusional
and that her schizophrenia diagnosis in 2008 had been based on cocaine use and
was not “regular schizophrenia.”  She
also said that she did not think she would get worse and that she had “no
feelings of doing harm to anybody” or to herself.  Nonetheless, Dr. Atkinson testified that prior
to her 2008 admission into the mental health facility, P.R.G. had stopped
taking her medication, leading to “some domestic issues, violence and such,”
and indicated that prior to her current assault charge, P.R.G.
“had not been compliant with taking her medication.”

Viewing
the evidence in the light most favorable to the finding and giving deference to
the trial court’s determination of the witnesses’ credibility and demeanor, the
trial court could have formed a firm belief or conclusion that P.R.G.’s mental
illness prevented her from having the capacity to make a decision regarding the
administration of psychoactive medication. 
Therefore, we conclude that the evidence is legally sufficient to
support the trial court’s capacity finding. 
See K.E.W., 315 S.W.3d at 20; D.P. v. State, Nos. 01-09-00097-CV,
01-10-00002-CV, 2010 WL 376007, at *8 (Tex. App.—Houston [1st Dist.] Feb. 4, 2010, no pet.) (mem. op.) (holding evidence legally
sufficient to support capacity finding when physician testified that appellant
lacked capacity because he was delusional and did not think he was sick).

Further,
although P.R.G. complained about the side effects of her previous medications
and attempted to excuse her schizophrenia diagnosis based on drug use, most of
her testimony focused on her efforts to regain competency instead of showing
that she had the capacity to make a decision regarding the proposed
treatment.  Therefore, we conclude that
the evidence is also factually sufficient to support the trial court’s capacity
finding.  See H.R.M., 209 S.W.3d at 108; see
also D.P., 2010 WL 376007, at
*8–9 (concluding that evidence that appellant lacked capacity was factually
sufficient when the evidence showed that appellant denied the fact that he
suffered from paranoid schizophrenia, which was otherwise unrefuted, and
indicated that his difficulties over the years had been caused by medication
and not his mental illness).  We overrule
this portion of P.R.G.’s second issue.

3. 
Best Interest

In
the remaining portion of P.R.G.’s second issue, she challenges the legal and
factual sufficiency of the evidence to support the trial court’s best interest
finding.

In
making its best interest findings under either ground of section 574.106(a-1),
the trial court shall consider:  (1) the
patient’s expressed preferences regarding treatment with psychoactive
medication; (2) the patient’s religious beliefs;[6] (3)
the risks and benefits, from the patient’s perspective, of taking psychoactive
medication; (4) the consequences to the patient if the psychoactive medication
is not administered; (5) the patient’s prognosis if she is treated with
psychoactive medication; (6) alternative, less intrusive treatments that are
likely to produce the same results as treatment with psychoactive medication;
and (7) less intrusive treatments likely to secure the patient’s agreement to
take the psychoactive medication.  Tex. Health & Safety Code Ann. § 574.106(b).

P.R.G.
expressed that she did not want to take the medication because of the side
effects she had experienced from the medications she had taken before and
because she did not think she needed it to regain competency, she had not been
hearing voices and was not delusional, and her 2008 schizophrenia diagnosis had
been cocaine-related.

Dr.
Atkinson testified that an antipsychotic medication like Haldol
would help decrease P.R.G.’s agitation, stop her from hearing voices, prevent
further deterioration of P.R.G.’s condition, improve her quality of life, and
help her regain competency.  He indicated
that if P.R.G.’s condition continued to deteriorate, she might become dangerous
to herself or others.  He also described
the side effects—some permanent—that the medication could cause.

In
his application, Dr. Atkinson stated that P.R.G.’s prognosis was “fair” with
psychoactive medication treatment, and he testified that there were no medical
alternatives that would likely produce the same benefits, that therapy classes
would not be sufficient to restore P.R.G. to competency, and that there were no
less intrusive treatments likely to secure P.R.G.’s agreement to take the
medication.

Viewing
the evidence in the light most favorable to the best interest finding, we hold
that the trial court could have reasonably formed a firm belief or conviction
that treatment with Haldol was in P.R.G.’s best interest.  See
K.E.W., 315 S.W.3d at 20; see also
M.H. v. State, No. 01-09-00205-CV, 2009 WL 2050988, at *4–5 (Tex.
App.—Houston [1st Dist.] July 16, 2009, no pet.) (mem. op.) (concluding that the
evidence was sufficient to support the trial court’s best interest finding when
appellant did not present any evidence to dispute physician’s testimony about
the treatment’s benefits and lack of alternative treatments for appellant’s
bipolar disorder with manic and psychotic features).  Likewise, based on the entire record, we hold
that the trial court could have reasonably formed the same firm belief or
conviction, based on its determination of the witnesses’ credibility and the
weight to be given their testimonies.  See H.R.M., 209 S.W.3d
at 108–09.  Therefore, we overrule
the remaining portion of P.R.G.’s second issue.

IV.  Conclusion

Having
sustained part of P.R.G.’s first issue, concluding that there is no evidence to
support the trial court’s finding that “the patient presents a danger to the
patient or others in the inpatient facility in which the patient is being
treated as a result of a mental disorder or mental defect as determined under
Section 574.1065, Texas Health and Safety Code,” we delete that finding from
the trial court’s order.  Having
overruled P.R.G.’s second issue, we affirm the trial court’s order as modified.

 

 

                                                                             
 
 
 
 
 
 
 
 
 BOB MCCOY

                                                                             
 
 
 JUSTICE

 

PANEL:  GARDNER, MCCOY, and MEIER,
JJ.

 

DELIVERED:  November 8, 2012











[1]See Tex. R. App. P. 47.4.





[2]On
cross-examination, Dr. Atkinson testified that Dr. Fadow had made the following
statement in one of his psychiatric evaluations of P.R.G.: “I did offer to
start her back on medications that she’s taken in the past, including both
Abilify and Seroquel, but she declined to take either medications.  I did offer her alternatives such as
Risperdal, and she declined this as well.” 
Dr. Atkinson said that he based his assumption that Dr. Fadow had fully
informed P.R.G. of the risks and benefits of antipsychotic medications on these
statements.





[3]Dr.
Atkinson described dyskinesias as muscle contractions and distortions and
oculogyria as “[h]er eyes would turn up, and that would be very frightening and
upsetting.”





[4]P.R.G.
said that the side effects from the medications she had taken before made her
heart feel like it was “about to bust,” and said, “I get to where I can’t move;
I can’t function; I can’t cook; I can’t take a bath; I drool at the mouth.  I don’t want to get up and go to class.  I don’t want to get up and go to work.  All I want to do is lay and sleep.”





[5]Dr. Atkinson also
indicated that he did not discuss with P.R.G. the risks and benefits of the
medication, and he rested his assumption that another doctor had discussed
these with P.R.G. on the other doctor’s note that he had offered to start
P.R.G. back on Abilify, Seroquel, or Risperdal. 
P.R.G. testified that she had taken Seroquel, Risperdal, Zoloft, and
Abilify in the past and had experienced unpleasant side effects from these
medications but that she had not previously taken Haldol.  The issue before us is P.R.G.’s capacity—her
ability to understand and make a decision—not the information she received,
particularly as she was present at the hearing and heard Dr. Atkinson’s
testimony about the side effects before she testified.





[6]There
was no testimony about P.R.G.’s religious beliefs.